UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

RANDALL K. DIXON )
 )
V. ) NO. 2:10-CV-160
 )
MICHAEL J. ASTRUE, )
Commissioner of Social Security )

REPORT AND RECOMMENDATION

The matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. This is an action for judicial review following the administrative denial of the plaintiff's applications for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act. These claims were denied by an Administrative Law Judge ["ALJ"] following a hearing. Both the plaintiff and the defendant Commissioner have filed dispositive Motions [Docs. 10 and 14].

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision

must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human Services*, 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

The plaintiff was 56 years of age at the time he applied for benefits, a person of "advanced age" under the Social Security regulations. He has a high school education with additional training beyond high school. His past relevant work was as a physician's assistant, which was skilled and light.

Plaintiff alleges disability due to degenerative disc disease, diabetes, atrial fibrillation, bilateral cataracts, obesity, asthma, sleep apnea, hypertension, depression and post-traumatic stress disorder. He alleges a disability onset date of October 8, 2007.

As an initial matter, the plaintiff did not assert any substantive argument regarding the ALJ's findings regarding diabetes, back and neck problems, asthma, sleep apnea, insomnia or osteoarthritis. The plaintiff's medical history, after excising evidence related to those conditions, is summarized in the Commissioner's brief as follows:

> In November 2007, Dr. Michael Shahbazi, M.D., an ophthalmologist, completed a vision questionnaire based on his examination of Plaintiff in April 2007 (Tr. 180-81). Dr. Shahbazi diagnosed Plaintiff with visually significant cataracts (bilateral, severe) (Tr. 180). He noted that Plaintiff had extreme blurriness in both eyes, which was worse with opposing or tangential lights; marked nearsightedness with best correction to 20/100; and constant double vision with additional night-vision problems (Tr. 180). Plaintiff could read with his left eye for three to ten seconds and could read with his right eye without lenses as long as material was one to two inches away (Tr. 180). Dr. Shahbazi opined that Plaintiff could never perform activities requiring near acuity or depth perception; could rarely perform activities requiring far acuity or field of vision; and could occasionally perform activities requiring accommodation or color vision (Tr. 180). He further opined that Plaintiff could not

2

see well enough to bend over and pick up any amount of weight and should never stoop (bend), crouch/squat, or climb ladders (Tr. 181). Dr. Shahbazi concluded that Plaintiff could not see well enough to perform any type of sustained activity, but would "greatly improve with bilateral [cataract] surgery" (Tr. 181).

In May 2008, Dr. Krish Purswani, M.D., examined Plaintiff (at the request of the Commissioner) and noted that he used no assistive device, had a normal gait and station, and was able to get on and off the exam table without assistance (Tr. 184). On examination, Plaintiff weighed 426 pounds at a height of 69 inches (Tr. 184). Plaintiff had slight crackling with knee motion, but range of motion was normal; straight leg raising was equal to 60 degrees on the right and 75 degrees on the left; seated straight leg raising was equal to five degrees on the right and ten degrees on the left; flexion was 85 degrees with normal extension and lateral flexion; and deep tendon reflexes and strength were normal (Tr. 185). Plaintiff was unable to perform a tandem gait but was able to stand on each foot (Tr. 185). Regarding his vision, Plaintiff had reduced pupillar reaction, reduced red reflex bilaterally, and both lenses of the eyes were almost opaque (Tr. 185). Dr. Purswani diagnosed Plaintiff with untreated bilateral cataracts, obesity, diabetes, chronic low back pain, spinal stenosis by history, asthma, osteoarthritis by history, hypertension, and history of atrial fibrillation (Tr. 186). Dr. Purswani opined that Plaintiff could not lift anything because of his untreated cataracts and obesity, could not walk for any length of time; and could stand for seven hours and sit for seven hours in an eight hour day (Tr. 186).

In July 2008, Dr. John Johnson, M.D., an ophthalmologist, examined Plaintiff and noted that his best corrected vision at that time was 20/200 and 20/80 (Tr. 187). He found that Plaintiff had significant nuclear and posterior subcapsular cataracts and that he needed cataract surgery in both eyes (Tr. 187). Dr. Johnson concluded that if cataract surgery was performed, Plaintiff would not need social security disability benefits at the present time (Tr. 187).

In August 2008, Dr. Louise Patikas, M.D. (a State Agency physician), reviewed Plaintiff's medical records and opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; could stand and/or walk for six hours and sit for six hours in an eight-hour day; and could perform occasional posturals, with no climbing of ladders, ropes, or scaffolds (Tr. 191-92). Dr. Patikas noted Plaintiff's height of 69 inches and weight of 426 pounds (Tr. 191-92). Dr. Patikas further limited Plaintiff to work that only required limited far acuity and no exposure to hazards (Tr. 193-94). Dr. Patikas acknowledged Dr. Purswani's opinion that Plaintiff could not lift or walk due to bilateral cataracts and morbid obesity; however, Dr. Patikas opined that the objective findings supported a light residual functional capacity with gross vision limitations as Plaintiff maintained 20/80 vision in his better eye and had normal range of motion universally (Tr. 196). He also noted that with proper diet, exercise, and medical management, weight loss was anticipated (Tr. 197). In October 2008, Dr. Lloyd Walwyn, M.D., reviewed Plaintiff's medical records and affirmed Dr. Patikas's August 2008 assessment (Tr. 150).

Plaintiff underwent cataract surgery at a VA Medical Center on his right eye in November 2008 (Tr. 244, 325) and by December 2008, he had 20/20 vision in his

3

right eye (Tr. 324). Plaintiff underwent cataract surgery on his left eye in March 2009 (Tr. 329) and by April 22, 2009, he had 20/80 vision in his left eye (Tr. 287).

In August 2009, Plaintiff reported an intentional weight loss of 40 pounds over a nine month period, and his weight was recorded as 398.5 pounds with a height of 70 inches (Tr. 342-43).

Regarding Plaintiff's mental health, he underwent screening for depression and post traumatic stress disorder in April 2008 (Tr. 265-66). Although his screening was positive for these diagnoses, he declined any mental health consult, post traumatic stress disorder consult, or any psychiatric consult (Tr. 258-59, 262-66). Plaintiff also declined antidepressant medication (Tr. 262). The record indicates no further mental health treatment until February 2009, at which time Sarah Drenan, Ph.D., a psychologist, diagnosed Plaintiff with depression (not otherwise specified) and a rule-out diagnosis of post traumatic stress disorder (PTSD) (Tr. 303-04, 308-14). In March 2009, Dr. Drenan changed her diagnosis to PTSD, noted that Plaintiff showed moderate anxiety and depression, and assigned Plaintiff a Global Assessment of Functioning (GAF) score of 55$_4$ (Tr. 304-08). Treatment notes from April 2009 indicate that Plaintiff experienced issues and difficulties in relation to the mental illness of his son; Plaintiff talked about his son's mental health issues several times during his treatment visit, reporting that his son was not taking prescribed medication and was very difficult to live with (Tr. 290). In August 2009, Plaintiff reported that his mental health sessions had been very helpful (Tr. 342); he had good eye contact, no apparent disturbance in thought process or content, his behavior was pleasant and responsive, his affect was congruent with his mood, and he had normal cognition, memory, insight, and judgment (Tr. 344).

[Doc. 15, pgs. 3-6].

At the administrative hearing, the ALJ asked Cathy D. Sanders, a Vocational Expert ["VE"] regarding the vocational characteristics of the plaintiff's past relevant work as a physician's assistant. She stated that he had several transferable skills, such as "knowledge of the DCM codes, office procedures and how to set up equipment in a medical office, and familiarity with insurance terminology." She stated that these would be transferable to sedentary work. The ALJ then asked her to assume a person of plaintiff's age, education, and work experience, who could do "light work with occasional posturals; no ropes, ladders, scaffolds; job not requiring perfect vision–and avoiding hazards, including unprotected heights; and this person could do skilled work." When asked if there would be jobs such a

4

person could perform, with plaintiff's transferrable skills, she identified the jobs of hospital admissions clerk, outpatient admitting clerk, medical technicians clerk, and medical receptionist, which would be at the sedentary level. These jobs would not require the plaintiff to get up and move around. She stated that there were 4,200 in the regional economy and 625,000 in the national economy. When asked if there were jobs if plaintiff's testimony at the hearing was "true and correct," she stated there would be no jobs. If plaintiff were as limited as opined by Dr. Purswani and Dr. Shabazi, there would be no jobs. She also testified that some slight adjustment to these jobs would need to be made by the plaintiff. (Tr. 32-36).

In his hearing decision, the ALJ found that the plaintiff had "a severe combination of impairments" consisting of degenerative disc disease, diabetes, atrial fibrillation, a history of bilateral cataracts with surgical removal, and obesity. (Tr. 14). After evaluating the evidence from the VA regarding plaintiff's depression and post traumatic stress disorder ["PTSD] from the VA, the ALJ found that plaintiff's GAF of 55 in 2009 which would indicate moderate symptoms, was caused by "a specific situational life stressor," and that plaintiff did not have a severe mental impairment. (Tr. 15 and 16). He found that the plaintiff had the residual functional capacity ["RFC"] for light work "which does not require perfect vision and allows for: occasional postural limitations; no climbing ropes, ladders and scaffolds; and avoidance of hazards including unprotected heights. (Tr. 16).

He gave no weight to Dr. Shabazi's report because his assessment "was based on a one-time exam indicates that the claimant would improve with treatment." (Tr. 18). That improvement was noted in reports from the VA showing 20/20 vision in the right eye and 20/80 in the left following cataract removal procedures in November of 2008 and March of

5

2009. (Tr. 18-19). With regard to obesity, the ALJ noted a 40 pound weight loss over a 9 week period reported in August, 2009, and stated that "continued weight loss was anticipated with proper diet, exercise, and medical management." (Tr. 19).

Dr. Purswani's consultative examination and medical assessment, obtained by the Commissioner, was not assigned any weight because it was based on a one-time exam and "is not supported by any other evidence in the record." (Tr. 19). The ALJ stated that the plaintiff's credibility "is severely diminished due to numerous inconsistencies" in the record regarding reports made by the plaintiff. (Tr. 20).

Finally, the ALJ found that the plaintiff had transferrable work skills. Based upon the testimony of the VE at the hearing, he found that there was a significant number of jobs which the plaintiff could perform. Accordingly, he was found to be not disabled. (Tr. 21-22).

Plaintiff asserts a variety of errors. First, he states that the ALJ erred in giving no weight to the opinion of Dr. Purswani, who consultatively examined the plaintiff at the request of the Commissioner, that the plaintiff could not lift anything or do any appreciable walking due to his (then) untreated cataracts and his morbid obesity. He states that the ALJ also erred in giving no weight to the opinion given by Dr. Shabazi, the ophthalmologist who first opined as to the severe visual limitations of plaintiff. He also argues that since more than one year elapsed between Dr. Shabazi's opinion and the cataract surgery on the first eye, he would at least be entitled to benefits for that period of time. With respect to both of these examining doctors, the VE opined that there would be no jobs with the limitations either of them imposed. Plaintiff further asserts that the ALJ erred in not finding a mental impairment, not properly evaluating the effects of plaintiff's morbid obesity on his ability to work, and not

6

including either in the hypothetical to the VE.

As an initial matter, the Court would question whether the ALJ and the Commissioner really wish the Court to consider total rejection of a medical assessment *solely*, or even largely, on the basis that it is a one-time consultative examination? The vast majority of consultative exams are performed, as was Dr. Purswani's, at the request of the Commissioner.[1] In a great number of cases, such one-time consultative examiners are deemed both a basis for the ALJ to have discounted the opinion of a treating source which was based largely upon subjective complaints, and as substantial evidence for the ALJ's RFC finding. The Court would invite the drafter(s) of the Commissioner's brief in this case and the ALJ to step back and take an objective look at how that argument looks and smells to someone for who, like them, has dealt with far more Social Security appeals than just this one.

That being said, Dr. Purswani is basing his limitations on what he perceived as near blindness of the plaintiff and his obesity. With respect to the plaintiff's obesity, Dr. Purswani's objective findings such as range of motion, walking and getting on and off of the examination table without assistance, and the like do not indicate someone who can never lift any amount or walk any distance on that basis. Likewise, the vision problems from the then untreated cataracts was present, but was it restrictive to the degree opined by Dr. Purswani? In classic terms, was there substantial evidence upon which the ALJ could legitimately rely.

In this particular instance, there is the extremely and unusually well-explained opinion of the State Agency physician, Dr. Louise Patikas. Her bottom line opinion was that

---

[1] Also, where would that leave the assessments of State Agency physicians and psychologists, who do not examine or observe the claimant even *once*?

7

"objective findings supports light RFC s/ gross vision limits as claimant maintains Visual Acuity of 20/80 in better eye and has normal range of motion universally." (Tr. 196). Generally, this Court considers the opinions of consultative examiners to be superior evidence of a plaintiff's capabilities, especially where there are strong objective findings that can be better observed by an in person examination. However, Dr. Patikas espoused logical reasons for her opinion on the effects of plaintiff's visual acuity and obesity on his level of function. Dr. Purswani's own objective findings lend credence to Dr. Patikas' assessment. In the opinion of the Court, her opinion provides substantial evidence for the physical RFC finding and the question to the VE, provided the ALJ was correct in his determinations regarding the lack of a mental impairment.

Dr. Shabazi's assessment is even more suspect. This ophthalmologist opines not only regarding the plaintiff's vision but also regarding the effects of his obesity. There is no indication in Dr. Shabazi's brief report that he conducted range of motion studies, or did x-rays of plaintiff's load bearing joints, or anything else in the way of a physical examination.

Also, it is obvious that the plaintiff attained good results from his surgery, having 20/20 vision in one eye and 20/80 in the other. As noted by the ALJ, following the last eye surgery, plaintiff stated that reading and researching on the internet were things that he enjoyed. At the hearing, he stated he enjoyed reading during the day for considerable periods. (Tr. 20).

Plaintiff argues for at least a closed period of disability during the time between Dr. Shabazi's report and the date of the first eye surgery. However, Dr. Patakis opined that with that degree of restriction plaintiff could still perform light work which accommodated his "gross vision limits."

8

Case 2:10-cv-00160-JRG-DHI  Document 16  Filed 08/18/11  Page 8 of 10  PageID #: 66

A different problem is presented by the plaintiff's alleged depression and post-traumatic stress disorder. Here there is evidence from the Veteran's Administration that the plaintiff was diagnosed with both conditions and treated. His Global Assessment of Functioning ["GAF"] was found to be 55. The ALJ determined that this was a result of the "situational life stressor" of plaintiff's son having mental illness, and that the plaintiff felt that the "mental health sessions had been very helpful." (Tr. 15). He therefore determined that the GAF was entitled to no weight and that the mental impairments were not severe.

In making this determination, he was not weighing conflicting medical opinions. There was no consultative mental evaluation. In fact, there was no review by a State Agency psychologist, at least none is listed in the index to the claims folder. The ALJ opined on his own that the plaintiff's mental problems were not severe. Even if the ALJ was correct, from a mental health standpoint, that the GAF was caused by the isolated situational stressor of his son's mental illness, the VA psychologist noted plaintiff "endorsed cumulative traumatic events (seeing bodies, helping wounded and dying persons, and having to transport and register dead bodies)" while serving as an Air Force medic. The VA further stated that "these symptoms began while serving in the military and have caused the veteran definite social and occupational distress as described above." (Tr. 307). Thus, he had a long-standing and deep seated mental problem totally unrelated to the issue with his son.

In this case, the only proper course would have been to have a consultative examination to determine the degree of the plaintiff's mental impairment. The position of the Commissioner was not substantially justified regarding the handling of the alleged mental impairment.

9

The plaintiff asserts that the Court should order an award benefits. This case is far from so "cut and dried" as to prompt such an order. The case should be remanded however for a consultative mental examination and such other and further development as the Commissioner may wish. After determination regarding the severity of any mental impairment and the functional limitations imposed thereby, another hearing should be held and a proper hypothetical posed to a vocational expert.

It is respectfully recommended, in accordance with the above, that the plaintiff's Motion for Judgment on the Pleadings [Doc. 10] be GRANTED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 14] be DENIED.[2]

Respectfully submitted:

  s/ Dennis H. Inman
United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).